No. 22-30352

In The

# United States Court of Appeals
### For The Fifth Circuit

**JERRY ROGERS, JR.,**

*Plaintiff-Appellee,*

*v.*

**RANDY SMITH, SHERIFF; DANNY CULPEPER; KEITH CANIZARO,**

*Defendants-Appellants.*

*On Appeal from the United States District Court for the
Eastern District of Louisiana, New Orleans Division,
No. 2:20-CV-517, Honorable Jane T. Milazzo, Presiding*

---

## BRIEF OF AMICUS CURIAE INSTITUTE FOR JUSTICE IN SUPPORT OF PLAINTIFF-APPELLEE

---

Jared McClain, *Lead Counsel*
Anna J. Goodman
Patrick Jaicomo
Anya Bidwell
INSTITUTE FOR JUSTICE
901 North Glebe Road, Suite 900
Arlington, VA 22203
(703) 682-9320
jmcclain@ij.org

*Counsel for Amicus Curiae
Institute for Justice*

January 24, 2023

# SUPPLEMENTAL STATEMENT OF INTERESTED PARTIES

Pursuant to Fifth Circuit Rule 29.2, the undersigned counsel certifies that the following listed persons and entities, in addition to those listed in the parties' briefs, have an interest in the outcome of this case.

**Amicus Curiae**
Institute for Justice

**Counsel for Amicus Curiae**
Jared McClain (Institute for Justice)
Anna J. Goodman (Institute for Justice)
Patrick Jaicomo (Institute for Justice)
Anya Bidwell (Institute for Justice)

Undersigned counsel further certifies, pursuant to Federal Rule of Appellate Procedure 26.1(a), that amicus curiae Institute for Justice is not a publicly held corporation and does not have any parent corporation, and that no publicly held corporation owns 10 percent or more of any corporation's stock.

Dated: January 24, 2023                /s/ Jared McClain
                                       *Lead Counsel for Amicus Curiae*
                                       *Institute for Justice*

# TABLE OF CONTENTS

**Page**

SUPPLEMENTAL STATEMENT OF INTERESTED PARTIES ....................i

TABLE OF AUTHORITIES .................................................................iii

INTEREST OF AMICUS CURIAE....................................................... 1

SUMMARY OF ARGUMENT ............................................................... 1

ARGUMENT ......................................................................................... 4

    I.    Qualified Immunity Does Not Protect Officers Who
        Should Know They Are Violating Rights ................................. 4

        A.    Qualified Immunity Should Not Protect Deliberative
            Constitutional Violations.................................................. 8

        B.    Qualified Immunity Does Not Protect an Obvious
            Constitutional Violation ..................................................15

    II.    Section 1983 Prevents Reliance on Warrants and State Laws
         that Officers Should Know Are Unconstitutional .....................21

        A.    A Signed Warrant Does Not Extend Judicial Immunity
            to Executive Officials.......................................................23

        B.    Reliance On an Unconstitutional Law Does Not
            Entitle Officers to Qualified Immunity ...........................27

CONCLUSION ................................................................................... 32

CERTIFICATE OF SERVICE ........................................................... 34

CERTIFICATE OF COMPLIANCE ................................................... 35

# TABLE OF AUTHORITIES

**Cases**                                                          **Page(s)**

*Anderson v. Larpenter,*
2017 WL 3064805 (E.D. La. July 19, 2017) ........................................ 24

*Anderson v. Valdez,*
845 F.3d 580 (5th Cir. 2016) .............................................................. 16

*Ashcroft v. al-Kidd,*
563 U.S. 731 (2011) ..................................................................... 11, 12

*Atwater v. Lago Vista,*
532 U.S. 318 (2001) ............................................................................ 6

*Aubin v. Columbia Cas. Co.,*
272 F. Supp. 3d 828 (M.D. La. 2017)................................................. 32

*Brosseau v. Haugen,*
543 U.S. 194 (2004) .......................................................................... 12

*Carey v. Nev. Gaming Control Bd.,*
279 F.3d 873 (9th Cir. 2002)......................................................... 30, 31

*Citizens United v. FEC,*
558 U.S. 310 (2010) .......................................................................... 28

*Cooper v. Dillon,*
403 F.3d 1208 (11th Cir. 2005)......................................................... 30

*County of Sacramento v. Lewis,*
523 U.S. 833 (1998) ........................................................................ 4, 6

*Crawford-El v. Britton,*
523 U.S. 574 (1998) ................................................................... 5, 8, 15

*Dep't of Com. v. New York*,
   139 S. Ct. 2551 (2019) ............................................................ 16

*Edwards v. Aguillard*,
   482 U.S. 578 (1987) ................................................................ 28

*Escondido v. Emmons*,
   139 S. Ct. 500 (2019) .............................................................. 12

*Estate of Smart v. Wichita*,
   2018 WL 3744063 (D. Kan. Aug. 7, 2018) ................................. 5

*Felder v. Casey*,
   487 U.S. 131 (1988) ................................................................ 22

*Garrison v. Louisiana*,
   379 U.S. 64 (1964) ................................................ 2, 18, 19, 20

*Gonzaga Univ. v. Doe*,
   536 U.S. 273 (2002) ................................................................ 22

*Gonzalez v. Trevino*,
   42 F.4th 487 (5th Cir. 2022) ............................................. 10, 11

*Graham v. Connor*,
   490 U.S. 386 (1989) ............................................................. 4, 8

*Groh v. Ramirez*,
   540 U.S. 551 (2004) ................................................................ 24

*Guillemard-Ginorio v. Contreras-Gómez*,
   490 F.3d 31 (1st Cir. 2007) ............................................... 30, 31

*Harlow v. Fitzgerald*,
   457 U.S. 800 (1982) ................................................. 6, 7, 14, 15

*Hartman v. Moore*,
   547 U.S. 250 (2005) ................................................................ 18

*Hoggard v. Rhodes*,
 141 S. Ct. 2421 (2021) ........................................................ 10

*Holloman ex rel. Holloman v. Harland*,
 370 F.3d 1252 (11th Cir. 2004) ........................................ 12

*Hope v. Pelzer*,
 536 U.S. 730 (2002) .................................................... *passim*

*Horvath v. Leander*,
 946 F.3d 787 (5th Cir. 2020) ............................................ 5

*Hous. Cmty. Coll. Sys. v. Wilson*,
 142 S. Ct. 1253 (2022) ...................................................... 18

*Illinois v. Krull*,
 480 U.S. 340 (1987) .......................................................... 25

*Jennings v. Joshua Indep. Sch. Dist.*,
 877 F.2d 313 (5th Cir. 1989) .......................................... 24

*Jones v. Alfred H. Mayer Co.*,
 392 U.S. 409 (1968) .................................................... 21, 22

*Kisela v. Hughes*,
 138 S. Ct. 1148 (2018) .................................................... 5, 9

*Lawrence v. Reed*,
 406 F.3d 1224 (10th Cir. 2005) .................................. 30, 31

*Lawrence v. Texas*,
 539 U.S. 558 (2003) .......................................................... 28

*Lederman v. United States*,
 291 F.3d 36 (D.C. Cir. 2002) .......................................... 31

*Leonard v. Robinson*,
　477 F.3d 347 (6th Cir. 2007) ........................................................ 30, 32

*Malley v. Briggs*,
　475 U.S. 335 (1986) ................................................. 23, 24, 25, 26

*Manzanares v. Roosevelt Cnty. Adult Detention Ctr.*,
　331 F. Supp. 3d 1260 (D.N.M. 2018) ...................................... 5

*Messerschmidt v. Millender*,
　565 U.S. 535 (2012) ............................................. 23, 24, 25

*Michigan v. DeFillippo*,
　443 U.S. 31 (1979) ........................................................... 23

*Mitchell v. Forsyth*,
　472 U.S. 511 (1985) ................................................... 6, 7, 9

*McCoy v. Alamu*,
　950 F.3d 226 (5th Cir. 2020), *rev'd*, 141 S. Ct. 1364 (2021) .............. 17

*McLin v. Ard*,
　866 F.3d 682 (5th Cir. 2017) ........................................ *passim*

*Monell v. Dep't of Soc. Servs.*,
　436 U.S. 658 (1978) ........................................................ 22

*Morgan v. Swanson*,
　755 F.3d 757 (5th Cir. 2014) ...................................... 11, 12

*Myers v. Anderson*,
　238 U.S. 368 (1915) ........................................................ 30

*N.Y. Times Co. v. Sullivan*,
　37 U.S. 254 (1964) .......................................................... 18

*Obergefell v. Hodges*,
　135 S. Ct. 2584 (2015) .................................................... 28

*Parea v. Baca,*
  817 F.3d 1198 (10th Cir. 2016) ........................................................ 16

*Poindexter v. Greenhow,*
  114 U.S. 270 (1885) ....................................................................... 30

*Ryburn v. Huff,*
  565 U.S. 469 (2012) ................................................................... 6, 8, 9

*State v. Snyder,*
  277 So.2d 660 (La. 1973) .......................................................... 18, 28

*Taylor v. Riojas,*
  141 S. Ct. 52 (2020) ................................................................... 15, 17

*The Civil Rights Cases,*
  109 U.S. 3 (1883) ........................................................................... 22

*Timpa v. Dillard,*
  20 F.4th 1020 (5th Cir. 2021) ......................................................... 17

*Ventura v. Rutledge,*
  398 F. Supp. 3d 682 (E.D. Cal. 2019) ............................................... 5

*Villarreal v. City of Laredo,*
  44 F.4th 363, *reh'g granted,* 52 F.4th 265 (5th Cir. 2022) ................ 10

*Vives v. City of New York,*
  405 F.3d 115 (2d Cir. 2005) ........................................................... 30

*Wearry v. Foster,*
  52 F.4th 258 (5th Cir. 2022) ........................................................... 11

*Wyatt v. Cole,*
  504 U.S. 158 (1992) ................................................................... 5, 15

*Zadeh v. Robinson,*
  928 F.3d 457 (5th Cir. 2019) .................................................. 5, 16, 17

*Ziglar v. Abbasi*,
  137 S. Ct. 1843 (2017) ............................................................ 5

**Statutes**

Ku Klux Klan Act of 1871,
  ch. 22, § 1, 17 Stat. 13 (1871) ...................................... 21, 22

**Rules**

Fed. R. App. P. 26.1(a) ................................................................. i

Fed. R. App. P. 29(b) .................................................................. 1

5TH CIR. R. 29.2 ............................................................................ i

**Other Authorities**

2 Cong. Rec. 646 (1874) ............................................................ 21

Alexander A. Reinert,
  *Qualified Immunity's Flawed Foundation*,
  111 Calif. L. Rev. 101 (forthcoming),
  available at https://tinyurl.com/QI-Flawed-Fnd ................................ 21

David E. Engdahl,
  *Immunity and Accountability for Positive Governmental Wrongs*,
  44 U. Colo. L. Rev. 1 (1972) .............................................. 29

Evan Bernick,
  *It's Time to Limit Qualified Immunity*,
  Geo. J.L. & Pub. Pol'y: Legal Blog (Sept. 17, 2018),
  http://bit.ly/3HtbfNi ............................................................ 4

Joanna C. Schwartz,
  *Qualified Immunity's Biggest Lie*,
  88 U. Chi. L. Rev. 605 (2021) ............................................ 14

John C. Jeffries, Jr.,
*The Liability Rule for Constitutional Torts*,
99 Va. L. Rev. 207 (2013) ................................................................ 16

Joseph Story,
*Commentaries on the Constitution*, § 1671 (1833) ............................ 29

*Louisiana: Anti-Sodomy Law Stands*,
N.Y. Times (Apr. 15, 2014), *available at* http://bit.ly/3Hq4xrr ......... 29

Louisiana State Law Institute Constitutional Laws Committee,
*2022 Unconstitutional Statutes Biennial Report to the Legislature,*
(Mar. 28, 2022), *available at* https://bit.ly/3XLt2EM ........................ 29

William Baude,
*Is Qualified Immunity Unlawful?*,
106 Calif. L. Rev. 45 (2018) ............................................................ 22

## INTEREST OF AMICUS CURIAE[1]

The Institute for Justice ("IJ") is a nonprofit law firm dedicated to defending constitutional rights. IJ believes that it is critical that the courts enforce constitutional limits on governmental power to ensure that the public can hold officials accountable when they violate individual rights. Because immunity doctrines limit access to courts and the enforcement of rights, IJ litigates government immunity and accountability cases nationwide. IJ also works to protect the First Amendment, including in cases that involve political speech, because the right to speak critically of public officials is indispensable to a free society.

Given its mission, IJ has an interest in opposing qualified immunity in this case. This brief asks the Court to protect the well-established right, secured by § 1983, to criticize government officials without state-sanctioned retribution.

---

[1] Consistent with Fed. R. App. P. 29(b), Appellee consented to this brief, but Appellants did not. *See* Mot. for Leave. No party or party's counsel authored this brief in whole or in part, and no person other than *amicus* contributed money to prepare or submit this brief.

## SUMMARY OF ARGUMENT

Everyone in America enjoys a fundamental right to call a police officer a "stone cold rookie" with no experience and to say that "anything is better" than having that officer investigate a crime. Any reasonable police officer knows that. The constitutional principle is so obvious, in fact, that the police don't even need a judicial decision to explain it. And even if an officer needed clarity, this Court and the Supreme Court have both announced already that states like Louisiana cannot criminalize statements critical of public officials. *Garrison v. Louisiana*, 379 U.S. 64, 67 (1964); *McLin v. Ard*, 866 F.3d 682 (5th Cir. 2017).

Yet, knowing all that, St. Tammany Parish Sheriff Randy Smith and officers Danny Culpepper and Keith Canizaro still conspired to violate Jerry Rogers' constitutional rights as retribution for Rogers' criticizing Detective Daniel Buckner. Because they did so after the chance to deliberate and seek legal counsel—and because their conspiracy was so obviously unconstitutional—the judiciary cannot now shield them from liability.

Qualified immunity is always unlawful. But especially when an officer has the time and opportunity to deliberate and seek legal advice—

just as when the law is already obvious—the Supreme Court's rationale for immunizing state officials no longer supports denying individuals a right of action under 42 U.S.C. § 1983. The primary rationale for qualified immunity is to protect officers who make split-second decisions when it's not clear what the law requires. When officers can deliberate and seek legal advice, however, they should not be surprised that they can be held accountable for their unconstitutional actions.

Officers cannot avoid liability for violating someone's rights simply because a local magistrate signed off on a warrant or because there's an unconstitutional law on the books. Under the Supreme Court's formulation of qualified immunity, the issue remains whether the officers should have known that the law they were enforcing was unconstitutional.

The officers here had plenty of time to learn—and did learn—that the warrant they enforced was unconstitutional because Louisiana's criminal-defamation statute could not constitutionally apply to public officials like police officers. A ruling that qualified immunity protects their unconstitutional conduct would make a complete mockery of § 1983 and all the federal rights that Congress designed that statute to

safeguard against state interference. This Court should affirm the district court's correct decision.

## ARGUMENT

### I. Qualified Immunity Does Not Protect Officers Who Should Know They Are Violating Rights

When Congress enacted the Ku Klux Klan Act of 1871, now codified as § 1983, its explicit purpose was to provide a private right of action against state officers who violate federally protected rights. Over a century after its passage, however, the Supreme Court overrode that legislative judgment out of fear that Congress crafted a rule too harsh for times when law enforcement officers "make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving." *Graham v. Connor*, 490 U.S. 386, 397 (1989); *see also County of Sacramento v. Lewis*, 523 U.S. 833, 853 (1998) (same).

The Court's creation of qualified immunity allows officers pressed into split-second decisions to err *against* adhering to the constitutional limits on their own authority. This policy undermines the "foundational constitutional principle" that § 1983 embodies: "Where there is a right, there must be a remedy." Evan Bernick, *It's Time to Limit Qualified*

*Immunity*, Geo. J.L. & Pub. Pol'y: Legal Blog (Sept. 17, 2018), http://bit.ly/3HtbfNi.

There are many well-documented practical, textual, and separation-of-powers problems with the judiciary establishing immunity doctrines to insulate executive officers from liability for their constitutional violations—especially when the legislature has provided an explicit right of action like § 1983.[2]    Although this Court cannot

---

[2] *See, e.g., Kisela v. Hughes*, 138 S. Ct. 1148, 1162 (2018) (Sotomayor, J., dissenting) (Qualified immunity has effectively "gutt[ed]" constitutional protections.); *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1871 (2017) (Thomas, J., concurring in part) ("[W]e have diverged from the historical inquiry mandated by the statute [and] have completely reformulated qualified immunity along principles not at all embodied in the common law." (cleaned up)); *Crawford-El v. Britton*, 523 U.S. 574, 611 (1998) (Scalia, J., dissenting) ("[O]ur treatment of qualified immunity under [] § 1983 has not purported to be faithful to the common-law immunities that existed when § 1983 was enacted, and that the statute presumably intended to subsume"); *Wyatt v. Cole*, 504 U.S. 158, 170 (1992) (Kennedy, J., concurring) ("[I]n the context of qualified immunity ... we have diverged to a substantial degree from the historical standards."); *Zadeh v. Robinson*, 928 F.3d 457, 479, 480–81 (5th Cir. 2019) (Willett, J., concurring in part); *Horvath v. Leander*, 946 F.3d 787, 801 (5th Cir. 2020) (Ho, J., dissenting in part) ("[T]here is no textualist or originalist basis to support a 'clearly established' requirement in § 1983 cases."); *Ventura v. Rutledge*, 398 F. Supp. 3d 682, 697 n.6 (E.D. Cal. 2019) ("[T]his judge joins with those who have endorsed a complete re-examination of [qualified immunity] which, as it is currently applied, mandates illogical, unjust, and puzzling results in many cases."); *Estate of Smart v. Wichita*, 2018 WL 3744063, at *18 n.174 (D. Kan. Aug. 7, 2018) ("[T]he court is troubled by the continued march toward fully insulating police officers

overrule qualified immunity, it should not extend the doctrine beyond its foundational basis.

The Supreme Court created qualified immunity to let officers cross unclear constitutional lines in "the spur (and in the heat) of the moment" without fear of "surviving judicial second-guessing months and years" later. *Atwater v. Lago Vista*, 532 U.S. 318, 347 (2001); *see also Ryburn v. Huff*, 565 U.S. 469, 477 (2012) (admonishing judges to "be cautious about second-guessing a police officer's assessment, made on the scene, of the danger presented by a particular situation").  As a result, section 1983 now protects only those rights that are established clearly enough to ensure that officers have fair notice of what the law requires when deciding whether "to show restraint … 'in haste, under pressure, and frequently without the luxury of a second chance.'"  *Lewis*, 523 U.S. at 853 (citation omitted).

_____

from trial—and thereby denying any relief to victims of excessive force—in contradiction to the plain language of the Fourth Amendment"); *Manzanares v. Roosevelt Cnty. Adult Detention Ctr.*, 331 F. Supp. 3d 1260, 1294 n.10 (D.N.M. 2018) ("[Q]ualified immunity has increasingly diverged from the statutory and historical framework on which it is supposed to be based").

But the Court did not create a one-size-fits-all "license to lawless conduct." *Harlow v. Fitzgerald*, 457 U.S. 800, 819 (1982). Even under qualified immunity, officers are not "wholly free from concern for [] personal liability" when they have the chance to deliberate. *Mitchell v. Forsyth*, 472 U.S. 511, 524 (1985). The balance the Court struck between remedying rights violations and protecting agents of the state who violate those rights is a "fair notice" standard. *See Hope v. Pelzer*, 536 U.S. 730, 739–41 (2002). Qualified immunity deprives individuals of redress for constitutional injuries *only* when a reasonable officer could not be "expected to know that certain conduct would violate ... constitutional rights." *Harlow*, 457 U.S. at 819. When officers should know that their actions will intrude on someone's constitutional rights, they must still "be made to hesitate" and will be held liable if they don't. *See id.*

The chance to hesitate negates the policy underlying qualified immunity. Officers with time to deliberate and seek legal advice have a fair opportunity to determine whether their actions will violate someone's constitutional rights—except maybe when the law is genuinely unclear. When internal deliberations or legal advice should reasonably be able to determine how the law will apply to an officer's conduct, there is no

reason to treat that officer any more leniently than courts do in cases when the law is immediately obvious. *See Hope*, 536 U.S. at 741 ("[A] general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question[.]" (cleaned up)). There is nothing unfair about holding an officer accountable "for actions that he or she knew, *or should have known*, violated the constitutional rights of the plaintiff." *Crawford-El v. Britton*, 523 U.S. 574, 591 (1998) (emphasis added).

As this section will explain, qualified immunity does not apply in this case because the officers had fair notice that their plan to arrest Rogers was unconstitutional. They had the opportunity to deliberate over their choice and, even without that chance, it was obvious that the Constitution forbids arresting someone for criticizing a police officer. With a fair warning that they'd face liability, they cannot now duck the consequences of their actions.

## A. Qualified Immunity Should Not Protect Deliberative Constitutional Violations

When the Supreme Court created qualified immunity a few decades ago, one of its primary policy goals was to stop the judiciary from second-guessing the split-second decisions that law enforcement makes in

dangerous situations. *Graham v. Connor*, 490 U.S. 386, 397 (1989). According to the Court, the "proper perspective" for judging official conduct is that of "a reasonable officer forced to make a split-second decision in response to a rapidly unfolding chain of events." *Ryburn*, 565 U.S. at 477. Punishing only those violations of clearly established law protects officers acting in the field at times when they can't hesitate and it's "difficult … to determine how the relevant legal doctrine … will apply to the factual situation the officer confronts." *Kisela v. Hughes*, 138 S. Ct. 1148, 1152–53 (2018) (citation omitted).

At its core, the Supreme Court's notice inquiry asks whether a reasonable officer should have known better, given the circumstances. Officers remain subject to liability when they had "fair warning that their alleged [behavior] was unconstitutional." *Hope*, 536 U.S. at 739–41. So despite qualified immunity's many flaws when applied to split-second decision-making, the immunity standard still requires officers to deliberate and seek legal counsel when they can. *See id.*

Most of the time, government officials are not in high-pressure situations that require immediate action. Absent some exigency, officers must take a moment to "pause to consider whether a proposed course of

action can be squared with the Constitution and laws of the United States." *Mitchell*, 472 U.S. at 524. Officers who still cross constitutional boundaries after the chance to reflect and seek counsel can reasonably expect that a court might hold them accountable. The rationale behind qualified immunity does not justify giving the same benefit of the doubt to officers who conspire to violate someone's constitutional rights from behind their desks as those who must make split-second decisions.

As Justice Thomas highlighted recently, the Supreme Court's qualified-immunity decisions have never explained why the doctrine would provide the same protection to officers "who have time to make calculated choices about enacting or enforcing constitutional policies." *Hoggard v. Rhodes*, 141 S. Ct. 2421, 2422 (2021) (Thomas, J., statement respecting the denial of certiorari).

This Court has also identified the important distinction between split-second decisions and deliberative ones. Just last year, a panel of Chief Judge Richman, Judge Ho, and Judge Graves observed that "[t]here is a big difference between 'split-second decisions' by police officers and 'premeditated plans to arrest a person'" for constitutionally

protected activity.  *Villarreal v. City of Laredo*, <u>44 F.4th 363, 371</u>, *reh'g granted*, <u>52 F.4th 265</u> (5th Cir. 2022).

Similarly, Judge Oldham has recognized that officials engaged in "secret, deliberative, and intentional conspiracies" to retaliate against an individual for exercising their rights "should not get the same qualified-immunity benefits that cops on the beat might get." *Gonzalez v. Trevino*, <u>42 F.4th 487, 506</u>–07 (5th Cir. 2022) (Oldham, J., dissenting).  "[W]hen public officials make the deliberate and considered decision to trample on a citizen's constitutional rights, they deserve to be held accountable." *Wearry v. Foster*, <u>52 F.4th 258, 259</u> (5th Cir. 2022) (Ho, J., concurring in denial of rehearing).

This Court should clarify that it will hold officers accountable when they've had the chance to consider the legal consequences of their actions. The rationale for granting qualified immunity to officers who make split-second decisions does not justify immunizing deliberative ones.

At the very least, this Court should construe "clearly established" at a much higher level of generality when officers have a chance to

deliberate.[3]  Officers who can seek legal advice have a fair opportunity to
determine how established constitutional principles will apply to their
actions.  Qualified immunity should not absolve their considered choices

---

[3] This Court has previously declined to analyze the First
Amendment right against viewpoint discrimination at a "high level of
generality" because doing so would not have informed a school's
policymakers "the permissible extent of content restriction in a
classroom." *Morgan v. Swanson*, 755 F.3d 757, 760–61 (5th Cir. 2014)
(citing *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011)).  That decision,
which did not consider the split-second distinction advanced in this brief,
seemed to apply *al-Kidd*'s demand for specificity because its inherently
difficult to apply the First Amendment to public schools.  *See id*. at 760;
*id.* at 763 (Benavides, J., concurring).

Although the level of generality the Supreme Court prefers has
been a moving target, those cases in which it demands more specificity—
including *al-Kidd*—involve unconstitutional searches and seizures, an
area of law that the Supreme Court has deemed "[in]capable of precise
definition or mechanical application." *Brosseau v. Haugen*, 543 U.S. 194,
199 (2004) (citation omitted).  To the extent Supreme Court precedent
requires high specificity, it's when officers must apply a particularly fact-
bound standard like the Fourth Amendment in the face of rapidly
changing facts that might complicate "how the relevant legal doctrine …
will apply[.]" *Escondido v. Emmons*, 139 S. Ct. 500, 503 (2019) (citation
omitted).

No basis for qualified immunity supports requiring the same level
of specificity for deliberative decisions made after the opportunity for
legal counsel—especially outside of the Fourth Amendment.  *See
Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1269–70, 1278–79
(11th Cir. 2004) (reasoning that it is not unreasonable to expect educators
to be able to apply the relevant First Amendment standard
"notwithstanding the lack of a case with material factual similarities").

unless the law is genuinely unclear or precedent changes after an officer acts.

This case illustrates why qualified immunity should not shield deliberative decisions. The defendants' concocted their scheme over several days, while debating it internally and seeking the advice of counsel, and then ignored warnings that would have stopped a reasonable officer.

When officers discovered that Rogers, their former colleague, sent the critical emails, they tried unsuccessfully make a case for obstruction of justice. But Rogers hadn't obstructed justice, so they came up with plan B: arrest Rogers under a criminal-defamation statute. The warning flags began to fly immediately. When the defendants discussed the idea internally, another officer sent them this Court's decision in *McLin*, which held that Louisiana's criminal-defamation statute could not constitutionally apply to public officials. Refusing to take "no" for an answer, the defendants sought a second opinion from the District Attorney's Office. An ADA confirmed that arresting Rogers would be unconstitutional but agreed to consider the issue further. The ADA eventually followed up to reaffirm that the plan was unconstitutional,

but the officers had already decided to disregard his advice.  ROA.1228, 1856.  Undeterred by several bright-red warning flags, the officers sought a warrant—without mentioning the criminal-defamation law's infirmities—and arrested Rogers for his protected speech.

This case is the archetype of what fair notice looks like.  Indeed, it goes *well beyond* any kind of "fair notice" that qualified immunity might conceivably require.  Although research shows most officers never learn relevant circuit precedent,[4] the officers here actually found this Court's decision saying that the criminal law they relied on was unconstitutional. They not only had time to reflect on their actions and to seek legal advice—they did so.  Officers who use their chance for reflection to dream up distinctions between their circumstances and existing law rather than conforming their behavior to the Constitution do not get qualified immunity.

It would be easy enough for this Court to deny immunity because these specific officers learned their plan was unconstitutional and

---

[4] For a detailed analysis of how there is no real-world basis for the Supreme Court's assumption that police officers review circuit court decisions applying broad constitutional principles, *see* Joanna C. Schwartz, *Qualified Immunity's Biggest Lie*, 88 U. Chi. L. Rev. 605 (2021).

disregarded that advice. But the Supreme Court's fair-warning standard focuses on whether an *objective* officer could have reasonably learned how the law would apply—not on whether a particular defendant actively did so. *See Harlow*, <u>457 U.S. at 818</u>–19 (focusing on "the objective reasonableness of an official's conduct, as measured by reference to clearly established law"). Under *Harlow*'s "wholly objective standard," *Wyatt v. Cole*, <u>504 U.S. 158, 166</u> (1992), the question is whether a reasonable officer "should have known" what the clearly established law required given the facts known at the time. *See Crawford-El*, <u>523 U.S. at 591</u>.

Punishing only those officers who do the right thing and seek advice would discourage other officers from acting reasonably. The opportunity to deliberate and seek legal counsel is enough to put them on notice of potential liability. Because the officers here had that opportunity, qualified immunity is unavailable to them.

### B. Qualified Immunity Does Not Protect an Obvious Constitutional Violation

Qualified immunity's grounding in fair notice also explains why officers remain subject to liability when their violation of someone's rights is obvious, knowing, or the product of incompetency. *See, e.g.,*

*Taylor v. Riojas*, 141 S. Ct. 52, 54 (2020). Although a qualified-immunity inquiry typically focuses on whether the officers had the benefit of "materially similar" case on point, a constitutional rule can be so obvious that officers don't need a factually analogous case to provide "fair warning that their alleged [behavior] was unconstitutional." *Hope*, 536 U.S. at 739–41; *Anderson v. Valdez*, 845 F.3d 580, 600 (5th Cir. 2016).

Judges scrutinizing official conduct do not "exhibit a naiveté from which ordinary citizens are free." *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2575 (2019) (citation omitted). Nor must they conduct a "scavenger hunt" to find factually identical precedent to justify their every decision. *Parea v. Baca*, 817 F.3d 1198, 1204 (10th Cir. 2016). Sometimes governmental misconduct is just so obviously illegal that immunity cannot attach, even without a direct factual analog in previously decided cases.

Indeed, an inflexible demand for factually identical precedent would create a one-bite rule for police officers—shielding egregious but novel official conduct, while holding accountable less severe but more frequent violations. *See* John C. Jeffries, Jr., *The Liability Rule for Constitutional Torts*, 99 Va. L. Rev. 207, 256 (2013). Such a perversion

of qualified immunity would allow government officials to "duck consequences for bad behavior—no matter how palpably unreasonable— as long as they were the *first* to behave badly" in a particular way. *Zadeh v. Robinson*, 928 F.3d 457, 479 (5th Cir. 2019) (Willett, J., concurring in part).

That's why the Supreme Court has admonished that "[r]igid[] overreliance on factual similarity" is "danger[ous]." *Hope*, 536 U.S. at 742; *see Timpa v. Dillard*, 20 F.4th 1020, 1034 (5th Cir. 2021) ("notable factual distinctions" do not preclude "reasonable warning"). "[A] general constitutional rule may apply with obvious clarity to the specific conduct at issue" without any caselaw directly on point. *Hope*, 536 U.S. at 741 (citation omitted).

Employing this principle, the Supreme Court summarily reversed this Court twice recently for granting qualified immunity for obvious constitutional violations. First, in *Riojas*, the Court held that precedent was not required to provide fair notice that forcing a prisoner to sleep in a cell overflowing with excrement was unconstitutional. 141 S. Ct. at 52–54. Then, in *McCoy v. Alamu*, the Court ruled that it should be obvious

that an official cannot pepper-spray a prisoner in the face "for no reason at all." 950 F.3d 226, 229 (5th Cir. 2020), *rev'd,* 141 S. Ct. 1364 (2021).

It is equally obvious that the First Amendment prohibits arresting someone for their criticism of the police that the officers were on notice of their potential liability when they hatched their plan to punish Rogers for his comments about Detective Buckner.

Indeed, the First Amendment's protections are at a peak when safeguarding the right to criticize the government and its officials. *See N.Y. Times Co. v. Sullivan*, 37 U.S. 254, 272–73 (1964). That's why the Constitution restricts the states from "impos[ing] criminal sanctions for criticism of the official conduct of public officials." *Garrison*, 379 U.S. at 65; *see also State v. Snyder*, 277 So.2d 660, 665 (La. 1973) (ruling that the "actual malice" standard from *New York Times* applies to criminal defamation of public officials).

For *decades* now, the law has been "settled that as a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions, including criminal prosecutions, for speaking out[.]" *Hartman v. Moore*, 547 U.S. 250, 256 (2005); *see also Hous. Cmty. Coll. Sys. v. Wilson*, 142 S. Ct. 1253, 1259 (2022) ("[N]o one

before us questions that, as a general matter, the First Amendment prohibits government officials from subjecting individuals to retaliatory actions after the fact for having engaged in protected speech." (cleaned up)).

Even without counsel's advice or the decisions in *Garrison* and *McLin*, it should have been patently obvious to any reasonable officer that the Constitution prohibits them from arresting people in retaliation for criticism. A reasonable officer would not need to pore over the federal reporters to ascertain the clear constitutional line in this case. The First Amendment's application to speech critical of the government is so rote that a decision from this Court with these precise facts is unnecessary. Officers who violate well-established rights cannot escape liability just because they can come up with a few immaterial differences between prior decisions and the way they violated the law.

Regardless of whether the criticism is spoken in public or private, at day or night, or by email or social-media post, the First Amendment prohibits the police from punishing the speech. Any attorney can come up with *some* reasons—short of violating Rule 11—why prior cases are

distinguishable. But zealous lawyering cannot override the broad and well-established protections of the First Amendment.

Appellants' brief illustrates the absurdity of a rule that would allow officers to escape liability any time they can identify a single factual distinction between their unlawful behavior and established law. The idea that these officers might have thought that the Constitution prohibits civil suits for governmental criticism but not criminal ones (App.Br. 32–33), that they didn't realize the First Amendment right to criticize government officials extends to police officers (App.Br. 34), or that they knew the First Amendment protected Facebook posts but not emails (App.Br. 17) is simply unreasonable.

Qualified immunity does not require courts to be so credulous. As long as the law was obvious enough that a reasonable officer would have fair notice, qualified immunity does not bar a § 1983 claim.

But the officers don't stop there: they insist that the law could not have been clearly established because *Garrison* and *McLin* did not declare Louisiana's criminal defamation law facially, or "entirely," or "across the board," or "in all circumstances," or "*per se*," or "uniformly" unconstitutional. See App.Br. 5, 11, 17 n.8, 25 & n.12, 31. The Supreme

Court has never required a successful facial challenge to a state law before officers should know better than to enforce it. It's enough that a court has held that a law is unconstitutional as applied to a similar situation or that the law was obvious to begin with.

There is no serious debate that the right to speak out against government officials is well established under the First Amendment nor that Louisiana's criminal-defamation statute violated that First Amendment right as applied to public officials. Because the law was obvious, the defendants had fair warning that their conspiracy was illegal, this Court should affirm the district court's decision.

## II.   Section 1983 Prevents Reliance on Warrants and State Laws that Officers Should Know Are Unconstitutional

The 42d Congress explicitly guaranteed that individuals have a right of action to hold state officials liable for their violations of federal law "notwithstanding" any "law, statute, ordinance, regulation, custom, or usage of the State to the contrary[.]"[5] Klan Act, ch. 22, § 1, 17 Stat. 13

---

[5] As currently codified, § 1983 omits the law's original Notwithstanding Clause. That does not, however, change the substantive law; it's merely a byproduct of Congress' consolidating existing federal laws into the Revised Statutes of 1874—the first time Congress put all federal laws in one place. *See* Alexander A. Reinert, *Qualified Immunity's Flawed Foundation*, 111 Calif. L. Rev. 101, 170 (forthcoming), available at https://tinyurl.com/QI-Flawed-Fnd.

(1871).  In other words, Congress ensured that state officials could not avoid liability by relying on state laws that violate federally protected rights.  The whole point of § 1983 is to stop state officials from applying their local laws and customs in contravention of federal law.  *See, e.g.*, *Gonzaga Univ. v. Doe*, 536 U.S. 273, 285 (2002).

Congress enacted § 1983 to serve a broad, remedial purpose,—a purpose that, significantly, is not limited by any caveats or safe havens for reliance on state laws or immunities.  *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 685–86 (1978); William Baude, *Is Qualified Immunity Unlawful?*, 106 Calif. L. Rev. 45, 55–58 (2018).  To carry out § 1983's remedial purpose, courts must "accord[]" the statutory right of action "a sweep as broad as its language."  *Felder v. Casey*, 487 U.S. 131, 139 (1988) (citation omitted).

---

Congress knew it could not "condense seventeen volumes into one and use precisely the same words that have been used in those seventeen."  2 Cong. Rec. 646, 1210 (1874).  So, when the 43d Congress omitted statutory text (as with the Klan Act), it did not change the statute's meaning.  The omissions Congress accepted were "mere changes of phraseology not affecting the meaning of the law."  2 Cong. Rec. 646, 646, 648 (1874); *see also Jones v. Alfred H. Mayer Co.*, 392 U.S. 409, 422 n.29 (1968) (omitting Notwithstanding Clause from § 1982 was a non-substantive removal of "surplusage"); *The Civil Rights Cases*, 109 U.S. 3, 16–17 (1883) (omitting Notwithstanding Clause from the Civil Rights Act did not change the statute's character).

The defendants here want to invert that broad construction. It would contravene the text and purpose of § 1983 to grant immunity whenever the defendants can point to a state law or a magistrate's order. Regardless of whether the officers enforced a warrant or a statute, the question under the Supreme Court's fair-notice standard remains whether they should have known their conduct was unconstitutional. *Cf. Malley v. Briggs*, 475 U.S. 335, 345 (1986) (warrant); *Michigan v. DeFillippo*, 443 U.S. 31, 37–38 (1979) (unconstitutional statute).

The officers who conspired to arrest Rogers cannot escape liability because they should have known—despite the warrant and statute on which they relied—that Louisiana's criminal-defamation law could not apply constitutionally to speech critical of public officials.

## A. A Signed Warrant Does Not Extend Judicial Immunity to Executive Officials

The Supreme Court has made clear that "the fact that a neutral magistrate has issued a warrant authorizing the allegedly unconstitutional search or seizure does not end the inquiry into objective reasonableness." *Messerschmidt v. Millender*, 565 U.S. 535, 547 (2012). If a signed warrant were enough to shield officers from liability for enforcing an unconstitutional law, then the magistrate's absolute judicial

immunity would effectively extend to protect the executive branch as well—depriving individuals of *any* recourse when state officials violate their rights.    Fortunately, that's not how qualified immunity works: "Defendants will not be immune if, on an objective basis, it is obvious that no reasonably competent officer would have concluded that a warrant should issue." *Malley*, 475 U.S. at 341.

A signed warrant is just one factor in considering whether an officer "acted in an objectively reasonable manner" or whether they should have known better. *See Messerschmidt*, 565 U.S. at 546–47.  Accordingly, even when a magistrate signs a warrant, the court must still decide if "a reasonably well-trained officer … would have known that his affidavit failed to establish probable cause and that he should not have applied for a warrant." *Jennings v. Joshua Indep. Sch. Dist.*, 877 F.2d 313, 317 (5th Cir. 1989) (citation omitted).

An officer cannot reasonably rely on a warrant if they should have known it was constitutionally invalid.  *See Groh v. Ramirez*, 540 U.S. 551, 563–65 (2004) (no reasonable officer could have relied on a warrant that plainly did not comply with the Fourth Amendment); *see also Anderson v. Larpenter*, 2017 WL 3064805, at *9 (E.D. La. July 19, 2017) (no prudent

person would have believed the facts supported a warrant because protected speech could not constitutionally form the basis of a crime).¦

It is objectively unreasonable for an officer to rely on a warrant when they have fair notice the law that they're enforcing is unconstitutional. *Cf. Malley*, 475 U.S. at 354; *Illinois v. Krull*, 480 U.S. 340, 355 (1987) (holding that, similarly, officers cannot rely on warrants or statutes they can't reasonably presume to be valid (citing *Harlow*)); *but see Messerschmidt*, 565 U.S. at 547 (concluding that it was not unreasonable for officers to believe that the specific facts they knew about the defendant supported a warrant for all guns he might have, not just the sawed-off shotgun he just used to try to kill someone).

Officers with fair warning that a law is unconstitutional cannot "br[eak] the chain of causation for false arrest by submitting an affidavit to a judge." App.Br. 23. As the Supreme Court has explained, "ours is not an ideal system, and it is possible that a magistrate, working under docket pressures, will fail to perform as a magistrate should." *Malley*, 475 U.S. at 345–36. The onus is on the officers seeking the warrant "to minimize this danger by exercising reasonable professional judgment." *Id.* at 346.

As discussed in Section I, state officials have fair warning that they should not enforce unconstitutional laws—especially when they could deliberate or the law is obvious. Unlike in *Messerschmidt*, this is not a case where a reasonable officer could mistake whether they had sufficient facts to support a warrant—the law itself was unconstitutional, and the defendants here should have known that.

This case illustrates the danger with an approach that grants immunity to officers who abdicate their own constitutional duty in reliance on a magistrate. The officers had ample notice that the warrant they sought to arrest Rogers was based on an unconstitutional law. It had been established for years that the criminal-defamation statute upon which they relied was unconstitutional (at least as applied to public officials). A colleague sent them *McLin*, and an ADA advised them their plan was unconstitutional. They then neglected to mention that information when they sought a warrant. To permit these defendants to hide behind qualified immunity would limit § 1983's reach well beyond what the Supreme Court has already held, effectively rendering it meaningless so long as any official with absolute immunity signs off an unconstitutional scheme.

Ironically, even the magistrate whose decision the defendants now try to hide behind thinks that they should have "[a]bsolutely" told him they knew the law was unconstitutional. ROA.1206. The warnings from *Malley* about our imperfect system played out in this case. The magistrate signed the warrant while he was covering for the Duty Judge and simultaneously presiding over a trial. ROA.1206. He later told the FBI that he signed the warrant—despite his own concerns about the law's constitutionality—because the crime was still on the books and the warrant application satisfied all the statutory elements. ROA.840. Were it not for the defendants' bad-faith omission of this Court's ruling in *McLin* and the prosecutor's opinion that the law was unconstitutional, they would have never gotten the warrant they now claim shields them from liability. Qualified immunity does not protect such conduct.

## B. Reliance On an Unconstitutional Law Does Not Entitle Officers to Qualified Immunity

The defendants cannot escape liability because they enforced an unconstitutional law. Their brief betrays just how extreme their position is. Even now, they still insist that Louisiana's criminal-defamation statute remained "valid and enforceable" up until its repeal in 2021 (App.Br. 31)—despite rulings from the Supreme Court and this Court in

1964 and 2017 respectively that the statute violated the First Amendment as applied to public officials.

Qualified immunity does not depend on whether a state or local legislature repeals unconstitutional statutes. In our tripartite system of government, there is often a lag between when the judiciary declares a law unconstitutional (and thus unenforceable) and when, if ever, the legislature repeals that law. *See Snyder*, 277 So.2d at 668 (observing that Louisiana's criminal-defamation law was unconstitutional but that "[i]t is for the Legislature to correct such a constitutional infirmity").

Louisiana's legislature, for instance, knows that it has a few dozen unconstitutional laws on its books right now. *See* Louisiana State Law Institute Constitutional Laws Committee, *2022 Unconstitutional Statutes Biennial Report to the Legislature,* at iii (Mar. 28, 2022), *available at* https://bit.ly/3XLt2EM. One of those laws still requires communists to register with the state; another bans sodomy as a "crime against nature" despite *Lawrence v. Texas*, 539 U.S. 558 (2003); one bans gay marriage despite *Obergefell v. Hodges*, 135 S. Ct. 2584 (2015); one criminalizes the teaching of evolution despite *Edwards v. Aguillard*, 482

U.S. 578 (1987); and yet another imposes campaign-reporting requirements that violate of *Citizens United v. FEC*, 558 U.S. 310 (2010).

Despite commissioning a biennial report of its unconstitutional laws, the state legislature leaves plenty in its code. In 2014, the legislature even voted against repealing Louisiana's anti-sodomy law. *See Louisiana: Anti-Sodomy Law Stands*, N.Y. Times (Apr. 15, 2014), *available at* http://bit.ly/3Hq4xrr. That does not mean Louisiana's police can still arrest gay residents in reliance on the law. Officers are liable for damages when they should know that the law they plan to enforce is unconstitutional.

The defendants argue, however, that they can enforce any law with immunity so long as it's still "on the books." (App.Br. 11). This radical position would let state legislatures control which federal rights retain a remedy under § 1983 by simply refusing to repeal unconstitutional laws. This Court should forcefully reject such a wild expansion of qualified immunity.

Holding governmental officials liable for enforcing unconstitutional statutes is nothing new. Indeed, up until the mid-twentieth century, federal courts held public officials "strictly accountable for their

[unconstitutional] acts." David E. Engdahl, *Immunity and Accountability for Positive Governmental Wrongs*, 44 U. Colo. L. Rev. 1, 27, 77 (1972). Public officials, "like every other violator of the laws, respond[ed] in damages." Joseph Story, *Commentaries on the Constitution*, § 1671 (1833).

It was against this backdrop that the 42d Congress passed the Klan Act. Unsurprisingly, then, courts began recognizing claims under § 1983 when officials enforce unconstitutional statutes. *See, e.g.*, *Myers v. Anderson*, 238 U.S. 368, 377–79, 382 (1915) (denying immunity to election officials who prevented black men from voting pursuant to an unconstitutional statute); *Poindexter v. Greenhow*, 114 U.S. 270, 297 (1885) (holding official personally liable for enforcing a law later declared unconstitutional).

Even after the Supreme Court overstepped its constitutional authority and began curtailing § 1983, at least seven circuit courts of appeals have recognized that qualified immunity does not attach when state officials enforce a statute that a reasonable officer would know to be patently unconstitutional, or when they enforce a statute in an egregiously unconstitutional manner. *See Guillemard-Ginorio v.*

*Contreras-Gómez*, 490 F.3d 31 (1st Cir. 2007); *Leonard v. Robinson*, 477 F.3d 347 (6th Cir. 2007); *Lawrence v. Reed*, 406 F.3d 1224 (10th Cir. 2005); *Vives v. City of New York*, 405 F.3d 115 (2d Cir. 2005); *Cooper v. Dillon*, 403 F.3d 1208 (11th Cir. 2005); *Carey v. Nev. Gaming Control Bd.*, 279 F.3d 873 (9th Cir. 2002); *Lederman v. United States*, 291 F.3d 36 (D.C. Cir. 2002).

The Tenth Circuit, for example, has held that "officers are not always entitled to rely on the legislature's judgment that a statute is constitutional[.]"  *Lawrence*, 406 F.3d at 1232–33.  Some laws "are so obviously unconstitutional that we will require officials to second-guess the legislature and refuse to enforce an unconstitutional statute—or face a suit for damages if they don't."  *Id.* at 1233.  Just as in this case, qualified immunity was unavailable in *Lawrence* because, "[t]ime and again," the courts had made clear that laws like the one at issue were unconstitutional.  *Id.*; *see also Guillemard-Ginorio*, 490 F.3d at 40–41 (denying qualified immunity for revoking a professional license under a law that did not require a hearing because it has "long been established that a state may not suspend a professional license without a pre-deprivation hearing").

More pertinently, the Sixth Circuit has held that a claim for retaliatory arrest survives an officer's assertion of qualified immunity because "no reasonable police officer would believe that *any* of the three [] Michigan statutes relied upon by the district court are constitutional as applied to [the plaintiff's] political speech during a democratic assembly." *Leonard*, 477 F.3d at 359 (emphasis added); *see also Aubin v. Columbia Cas. Co.*, 272 F. Supp. 3d 828, 838–39 (M.D. La. 2017) (denying qualified immunity to an officer who enforced a "public intimidation" statute against a person who threatened to have the officer fired "[b]ased on the Supreme Court's repeated and long-standing precedent validating the right of citizens to verbally criticize police officers").

The same principles apply here: the officers cannot obtain qualified immunity for arresting a critic for violating a defamation law they should have known was unconstitutional.

## CONCLUSION

This Court should affirm the district court's denial of qualified immunity for the Appellants' deliberative and obvious violation of Rogers' rights.

Dated: January 24, 2023      Respectfully submitted,

<u>/s/ Jared McClain</u>
Jared McClain, *Lead Counsel*
Anna J. Goodman
Patrick Jaicomo
Anya Bidwell
INSTITUTE FOR JUSTICE
901 North Glebe Road,
Suite 900
Arlington, VA 22203
(703) 682-9320
jmcclain@ij.org

*Counsel for Amicus Curiae*
*Institute for Justice*

## CERTIFICATE OF SERVICE

I hereby certify that on January 24, 2023, I caused the foregoing Brief of Amicus Curiae Institute for Justice to be filed electronically with the Clerk of the Court using the Court's CM/ECF system, which will send notice of such filing to all registered CM/ECF users.

Dated: January 24, 2023       /s/ Jared McClain
                                   *Lead Counsel for Amicus Curiae*
                                   *Institute for Justice*

## CERTIFICATE OF COMPLIANCE

1.    This brief complies with the type-volume limitation in Fed. R. App. P. 29(a)(5) and 32(a)(7)(B) because it contains 6,492 words.

2.    This brief also complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in proportionally spaced typeface using Microsoft Word 2016 in 14-point Century Schoolbook font.

Dated: January 24, 2023          /s/ Jared McClain
*Lead Counsel for Amicus Curiae*
*Institute for Justice*

35